# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| URVANO RUIZ-SANCHEZ,<br><br>　　Petitioner-Plaintiff,<br><br>v.<br><br>ROBERT CULLEY, et al.,<br><br>　　Respondents-Defendants. | Case No.: 2:20-cv-00753-APG-NJK<br><br>**Order** |

Petitioner-plaintiff Urvano Ruiz-Sanchez, a counseled immigration detainee, has filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241. ECF No. 1. For the reasons discussed below, I deny Ruiz-Sanchez's petition.

**I.   Background**

Ruiz-Sanchez is a 61-year-old citizen of Mexico who has been detained by the United States Immigration and Customs Enforcement (ICE) division of the Department of Homeland Security (DHS) since December 19, 2019. ECF No. 1 at 17. Ruiz-Sanchez has been a lawful permanent resident of the United States since May 8, 1991. ECF No. 10-2. He has five children and six grandchildren who are United States citizens. ECF No. 1 at 6.

**a.   Criminal proceedings**

Ruiz-Sanchez was originally charged in Canyon County, Idaho on May 23, 2017 with one count of trafficking in methamphetamine or amphetamine and one enhancement penalty for being a persistent narcotics violator. ECF No. 10-3 at 4. On February 8, 2018, Ruiz-Sanchez pleaded guilty to possession of a controlled substance with the intent to deliver in return for the State dismissing the persistent violator enhancement. *Id.* at 16. On March 6, 2018, Ruiz-Sanchez

was sentenced to "a minimum period of confinement of two (2) years, followed by a subsequent indeterminate period of confinement not to exceed three (3) years, for a total unified term of five (5) years." *Id.* at 21.

**b.    Immigration proceedings**

Ruiz-Sanchez was initially placed into removal proceedings on October 11, 2002, following a criminal conviction for possession of a controlled substance. ECF No. 10-2 at 3. Ruiz-Sanchez applied for a waiver of removal which was approved by the Immigration Judge (IJ). *Id.*

On March 3, 2018, three days before his judgment of conviction was entered on his case in Canyon County, Idaho, Ruiz-Sanchez was encountered by an ICE officer and a detainer was placed. ECF No. 1 at 17.  On December 19, 2019, Ruiz-Sanchez was turned over to ICE custody, and on January 14, 2020, he was placed into removal proceedings. *Id.*  Ruiz-Sanchez contests the removal charges and has filed an application for withholding of removal based on his fear of returning to Mexico following his brother's murder. *Id.*; *see also* ECF No. 1 at 6.

Ruiz-Sanchez is subject to mandatory detention and has been unable to seek bond.[1] ECF No. 1 at 18; ECF No. 10 at 2.  He is currently detained at the Nevada Southern Detention Center (NSDC) in Pahrump, Nevada.

---

[1] The Immigration and Nationality Act provides a "complex statutory framework of detention authority," codified at 8 U.S.C. §§ 1226 and 1231. *Prieto-Romero v. Clark*, 534 F.3d 1053, 1057 (9th Cir. 2008).  "Where [a non-citizen] falls within this statutory scheme can affect whether his detention is mandatory or discretionary, as well as the kind of review process available to him if he wishes to contest the necessity of his detention." *Id.*  In general, § 1226(a) governs detention during the pendency of a non-citizen's removal proceedings.  DHS has discretionary authority under § 1226(a) to determine whether a non-citizen should be detained, released on bond, or released on conditional parole pending the completion of removal proceedings, unless the non-citizen falls within one of the categories of criminals described in § 1226(c), for whom detention is mandatory.  Ruiz-Sanchez is detained under § 1226(c).

### c. Federal habeas proceedings

Ruiz-Sanchez commenced this habeas proceeding on April 27, 2020. ECF No. 1. He presents one ground for relief under the Fifth Amendment's Due Process Clause: the federal government is subjecting him to cruel treatment and conditions of confinement that amount to punishment by failing to ensure his safety and health regarding COVID-19. *Id.* at 22. In his request for relief, Ruiz-Sanchez asks me to grant a writ of habeas corpus directing the respondents to immediately release him from custody or, alternatively, issue injunctive relief ordering the respondents to immediately release him from custody; issue a declaration that the conditions under which he and others are confined at NSDC place him at an unreasonable risk of contracting severe illness and death; and award him costs and reasonable attorneys' fees. *Id.* at 25-56.

## II. Governing law

### a. Federal habeas jurisdiction

Federal district courts may grant a writ of habeas corpus when a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); *see also Casas-Castrillon v. DHS*, 535 F.3d 942, 946 (9th Cir. 2008) (holding that a non-citizen petitioner held in custody pursuant to removal proceedings may "bring collateral legal challenges to the Attorney General's detention authority . . . through a petition for habeas corpus").

The respondents argue that Ruiz-Sanchez's petition does not properly challenge the conditions of his confinement. ECF No. 10 at 14-15; *see Crawford v. Bell*, 599 F.2d 890, 891 (9th Cir. 1979) (explaining that "the writ of habeas corpus is limited to attacks upon the legality or duration of confinement"); *see also Nettles v. Grounds*, 830 F.3d 922, 933 (9th Cir. 2016) ("[P]risoners may not challenge mere conditions of confinement in habeas corpus."). However,

as one federal district court explained in a similar case addressing COVID-19 concerns within a 28 U.S.C. § 2241 petition, "Petitioner is not challenging a specific condition of his confinement but instead claims that his confinement itself violates his due process rights—a direct challenge to the validity of his detention." *Habibi v. Barr*, No. 20-cv-00618-BAS-RBB, 2020 WL 1864642, at *2 n.2 (S.D. Cal. Apr. 14, 2020).  In that case, the federal district court was not persuaded by "the Government's position that the [28 U.S.C. § 2241] petition is an improper vehicle for Petitioner's claims." *Id.*  I agree and assume, for purposes of the present petition, that Ruiz-Sanchez has properly presented his 28 U.S.C. § 2241 petition. *See also Calderon v. Barr*, No. 2:20-cv-00891-KJM-GGH, 2020 WL 2394287, at *4 (E.D. Cal. May 12, 2020) ("Although uneasy with the habeas corpus vehicle to decide conditions of confinement issues, the undersigned will ultimately find habeas corpus subject matter jurisdiction to be proper.").

    **b. Standing**

    The respondents argue that Ruiz-Sanchez lacks standing because he cannot establish an injury in fact because his claim asserts only to a hypothetical future injury and he fails to demonstrate that his release will redress his alleged injury. ECF No. 10 at 13-14.  To have Article III standing, Ruiz-Sanchez must have suffered an "injury in fact," that is "concrete and particularized, and . . . actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotations and citations omitted).  And, it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (internal quotations and citations omitted).

    Even with only a single confirmed case of COVID-19 at NSDC, Ruiz-Sanchez has Article III standard to assert his claim. *See, e.g., Doe v. Barr*, No. 20-cv-02141-LB, 2020 WL 1820667, at *8 (N.D. Cal. Apr. 12, 2020) (explaining that "[t]he weight of authority supports the

conclusion that detainees have standing"). Indeed, as observed by the Supreme Court of the United States, "[a] remedy for unsafe conditions need not await a tragic event." *Helling v. McKinney*, 509 U.S. 25, 33 (1993); *see also Bent v. Barr*, No. 19-cv-06123-DMR, 2020 WL 1812850, at *3 (N.D. Cal. April 9, 2020) ("Given the exponential spread of the virus, the ability of COVID-19 to spread through asymptomatic individuals, and the inevitable delays of court proceedings, effective relief [for the petitioner] and other detainees may not be possible if they are forced to wait until their particular facility records a confirmed case.").

### c. Due process considerations

"[W]hen the State takes a person into its custody and holds them there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989). For individuals who have been convicted of a crime, this duty arises under the Eighth Amendment and is violated upon a showing of "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). However, immigration detention is civil confinement, even if the detainee has a prior criminal conviction. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). And the government's duty to oversee the welfare of federal civil detainees arises under the due process clause of the Fifth Amendment. *Demore v. Kim*, 538 U.S. 510, 523 (2003); *Youngberg v. Romero*, 457 U.S. 307, 315-16 (1982).

The Fifth Amendment requires that civil detainees "cannot be subjected to conditions that 'amount to punishment.'" *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). Thus, "civilly detained persons must be afforded more considerate treatment and conditions of confinement than criminals whose conditions of

confinement are designed to punish." *Padilla v. Yoo*, 678 F.3d 748, 759 (9th Cir. 2012) (internal quotation marks and citations omitted).

### III.     Ruiz-Sanchez has not demonstrated due process violations

Ruiz-Sanchez contends that, even considering the measures facilities have put in place, "[p]eople who are confined in prisons, jails, and detention centers will find it virtually impossible to engage in the necessary social distancing and increased hygiene measures required to mitigate the risk of transmission of" COVID-19. ECF No. 1 at 4. Ruiz-Sanchez explains that at NSDC "[p]eople share and touch objects used by others" including "[t]oilets, sinks, and shows," and "[f]ood preparation and service is communal with little opportunity for surface disinfection." *Id.* at 12. Ruiz-Sanchez claims that "immigration detention facilities lack adequate medical infrastructure to address the spread of infectious disease and treatment of people." *Id.* at 13.

The respondents note that NSDC has had only one inmate test positive for COVID-19, and that inmate, who was new and never entered the general population, was immediately placed in isolation. ECF No. 10 at 2. NSDC has instituted policies and practices to combat the risk of infection in its facility. *Id.* Specifically, the respondents set forth the following preventative protocols they have instituted:

  a. Screening: All individuals entering the facility, including detainees, are required to undergo a health screening prior to entry. Consistent with CDC guidance, this includes a screening questionnaire and temperature check.

  b. Mandatory 14-Day Quarantine on Intake: After passing screening, all new intakes are placed in a mandatory quarantine for 14 days and then released into their respective units. During the quarantine, all detainees are monitored and their temperatures are checked twice daily.

  c. Sanitization: The pods and common areas are cleaned and sanitized at least once per hour, every hour between 7:00 a.m. and 10:00 p.m. The entire facility is disinfected each day. Dining areas are cleaned and disinfected before, during, and after meals.

    d.  Personal Protective Equipment (PPE): All staff are required to wear masks and gloves. All detainees have been given masks and are encouraged to wear them. Staff sanitize the detainee masks each day. Detainees may request gloves which will be provided free of charge.

    e.  Proactive Monitoring: NSDC staff are taking proactive steps to identify symptoms or change in physical condition of detainees. For specialized pods for those designated high-risk (the BB Pod), the same staff are assigned only to that unit.

    f.  Testing: NSDC has the ability to test any detainee who exhibits or reports COVID-19 symptoms. NSDC follows CDC guidelines and tests only detainees who are symptomatic. As of today's date, two detainees have been tested (one positive, one negative).

    g.  Medical Care: Detainees are not required to go through the normal request system if they have COVID-19 complaints. Instead, they may directly seek medical attention which is always available.

    h.  Vulnerable Population Precautions: Detainees who meet CDC's definition of high risk were isolated from the remainder of population as of March 26, 2020. This was to eliminate and decrease exposure to COVID-19 to those deemed high-risk.[2]

    i.  Visitation and Transportation: Social visits have been placed on hold and legal visits are generally suspended, although such visits will be permitted on a case-by-case visit after the attorney is screened in accordance with the intake protocol described above. Detainee transport for medical treatment has been limited to essential and emergency services. Immigration proceedings are now conducted by video.

    j.  NSDC Capacity: NSDC has the ability to house 288 ICE detainees. As of May 3, 2020, the facility was operating at approximately 58% of that capacity, with only 168 ICE detainees. ICE detainees are housed separate from and do not mix with the general NSDC population.

*Id.* at 3-4 (internal citations omitted). The respondents also explained that Ruiz-Sanchez's pod can house 96 detainees but currently has only 39 detainees to allow for social distancing. *Id.* at 10.

---

[2] The respondents explain that Ruiz-Sanchez is not currently housed in a high-risk pod because hypertension is not a CDC high-risk factor. ECF No. 10 at 10.

7

1    In support of his claim that he is at an increased risk to suffer complications from
2 COVID-19, Ruiz-Sanchez argues that he suffers from hypertension, had a dry cough at his
3 hearing on March 26, 2020 before an IJ, and now suffers from "a persistent pain on the side of
4 his stomach." *Id.* at 17-18.  The respondents assert that Ruiz-Sanchez has never reported having
5 hypertension to NSDC, his vital signs were negative for hypertension, and he has never received
6 medication for hypertension at NSDC. ECF No. 10 at 4-5.  The respondents further assert that
7 Ruiz-Sanchez was seen by NSDC medical on March 26, 2020, but he reported only a runny
8 nose, sneezing, and seasonal allergies. ECF No. 10 at 5.  Since Ruiz-Sanchez's vital signs were
9 normal and his lungs sounded clear, he was prescribed an allergy medication. *Id.*; *see also* ECF
10 No. 11-5 at 3.  Ruiz-Sanchez has not submitted to NSDC any medical requests regarding
11 stomach pain, and his only report of stomach pain was due to constipation during his initial
12 intake in December 2019. ECF No. 10 at 5; *see also* ECF No. 11-5 at 3.  In his reply, Ruiz-
13 Sanchez does not discuss the discrepancy about his hypertension or the respondents' citations to
14 his medical records regarding his cough or stomach issues. ECF No. 15 at 10.

15    To be sure, courts across the United States have recognized the "unprecedented
16 magnitude of the COVID-19 pandemic." *United States v. Boatwright*, No. 2:19-cr-00301-GMN-
17 DJA, 2020 WL 1639855, at *5 (D. Nev. Apr. 2, 2020).  "Indeed, . . . new infections throughout
18 the United States continue to rise at an exponential rate." *United States v. Suzuki*, No. 2:15-cr-
19 00198-GMN-NJK (D. Nev. Apr. 6, 2020).  However, Ruiz-Sanchez has not alleged a current
20 Fifth Amendment violation. *See, e.g.*, *Dawson v. Asher*, No. C20-0409JLR-MAT, 2020 WL
21 1304557, at *2 (W.D. Wash. March 19, 2020) ("Plaintiffs do not cite to authority, and the court
22 is aware of none, under which the fact of detention itself becomes an 'excessive' condition solely
23 due to the risk of a communicable disease outbreak—even one as serious as COVID-19.")

The first positive COVID-19 test in Nevada occurred on March 2, 2020.[3] While the number of COVID-19 positive tests has increased in the general population of the state, there has only been one confirmed COVID-19 case at NSDC and that case appears to have been successfully isolated. An outbreak at NSDC is still possible given the challenges in maintaining social distancing in confined quarters. However, NSDC has instituted numerous protocols to prevent against an outbreak: new screening procedures, mandatory quarantine on intake, increased sanitization, availability of PPE for staff and detainees, proactive symptom monitoring, segregated housing for high-risk detainees, suspension of visits, and reduced capacity. The imposition of these protocols demonstrates that the government is fulfilling its "responsibility for [Ruiz-Sanchez's] safety and general well-being." *DeShaney*, 489 U.S. at 199-200. And I am not convinced that Ruiz-Sanchez's alleged medical issues demand further action by the government for it to fulfil these duties.

## IV.  Declaratory relief

Ruiz-Sanchez asks me to issue a declaration that the conditions under which he and others are confined at NSDC place him at an unreasonable risk of contracting severe illness and death. ECF No. 1 at 25-56. The respondents argue that Ruiz-Sanchez may not seek declaratory relief through his habeas petition and note that Ruiz-Sanchez has not cited the procedural vehicle from which this requested relief could be entered. ECF No. 10 at 15-16. Because I disagree that NSDC is placing Ruiz-Sanchez at an unreasonable risk of contracting severe illness and death, and because Ruiz-Sanchez fails to provide any legal authority for me to issue such a declaration, this request lacks merit.

---

[3] *See, e.g.*, Briana Erickson, *Patient Zero in Nevada's COVID-19 fight mending after month in coma*, LV Rev. J., Apr. 17, 2020, https://www.reviewjournal.com/local/north-las-vegas/patient-zero-in-nevadas-covid-19-fight-mending-after-month-in-a-coma-2008589/.

### V. Ruiz-Sanchez's request for attorneys' fees and costs

Ruiz-Sanchez requests an award of attorneys' fees and costs under the Equal Access to Justice Act ("EAJA"), 5 U.S.C. § 504 and 28 U.S.C. § 2412. The EAJA authorizes an "award to a prevailing party . . . [of] fees and other expenses . . . incurred by that party in any civil action . . . unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d). Because Ruiz-Sanchez's petition lacks merit, I will not award him attorneys' fees.

I THEREFORE ORDER that the Petition for Writ of Habeas Corpus (ECF No. 1) is **DENIED**.

I FURTHER ORDER the Clerk of the Court to enter judgment accordingly and close this case.

Dated: May 21, 2020.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE